UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, </br></br> Plaintiff, </br></br> v. </br></br> SELLIS ENTERPRISES, INC., D/B/A ROCKY VANDERS CAFÉ & BAR, an Illinois Corporation and SUSAN SELLIS, an individual, </br></br> Defendants. | Case No. 1:13-cv-08070 </br></br> Honorable Judge Edmond Chang </br></br> Magistrate Judge Daniel Martin |

## DEFENDANTS' MOTION TO DISMISS (CONTESTED)

Pursuant to Rule 12(b)(6) and Rule 12(b)(7) of the Federal Rules of Civil Procedure, Defendants Sellis Enterprises Inc., and Susan Sellis, ("Defendants") hereby moves the Court to dismiss Plaintiff Slep-Tone Entertainment Corporation's ("Slep-Tone's") Complaint for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

Slep-Tone is engaged in a nationwide litigation campaign. It has filed more than fifty (50) cookie cutter lawsuits, including this one. Slep-Tone manufactures and distributes compact discs ("CDs") containing music to popular songs along with data that displays the song lyrics on a video screen when the tracks are played. According to Slep-Tone, karaoke jockeys (or "KJs") have unlawfully copied the CDs and are using the copied music to perform karaoke shows and, in the course of doing so, are displaying Slep-Tone's SOUND CHOICE trademark without Slep-tone's consent.

However, rather than filing *copyright infringement* actions Slep-Tone is filing *trademark infringement* suits. These lawsuits, including this one, are based solely upon the alleged display of the SOUND CHOICE trademark on video screens during karaoke shows.

Slep-Tone has become the Righthaven of trademarks.[1] Slep-Tone has filed numerous lawsuits, apparently with little or no pre-filing investigation and no warning. In true Righthaven fashion, Slep-Tone has filed its lawsuits *en masse* for the purpose of coercing settlements rather than protecting legitimate intellectual property rights. Slep-Tone is obviously banking on the fact that it would be far less expensive for each defendant to settle the case than to fight Slep-Tone. This is perhaps best evidenced by the fact that only one of Slep-Tone's lawsuits have proceeded to trial and few have proceeded past the initial pleading stage.

Instead, Slep-Tone asserts various causes of action that are all species of trademark infringement. And therein lies the problem and the basis for this motion. A trademark owner does not have the right to control the public performance of an audiovisual work because no cause of action exists in trademark law for conduct that is traditionally within the bounds of copyright law. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33 (2003). This restriction on the scope of trademark law comes from the U.S. Constitution. Congress' power to grant a copyright is limited in time. U.S. Const. art. I, § 8, cl. 2 ("by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries"). In contrast, trademark rights are perpetual, depending only on continued use of the trademark in commerce. If trademark owners possessed the same monopoly rights existing under copyright law, a trademark would constitute a species of perpetual copyright. Because Congress lacks the power to provide for a perpetual copyright monopoly, no cause of action exists in trademark law for conduct traditionally within the bounds of copyright law.

Slep-Tone has fraudulently obtained Trademark Registration in order to institute a trolling scheme in order to drive sales that have diminished due to quality declines and a complete inability to maintain standards in an ever competitive economy.

---

[1] Righthaven LLC is the entity that filed more than 275 copyright infringement actions against defendants who copied all or part of newspaper articles on the websites without permission. Righthaven's business model was to extract settlement payments from each defendant using the threat of liability for statutory damages and attorneys' fees.

## STATEMENT OF ALLEGED FACTS

Plaintiff Slep-Tone is the manufacturer of karaoke accompaniment tracks. Slep-Tone owns federal trademark registrations for the SOUND CHOICE word mark and the SOUND CHOICE design mark (the "SOUND CHOICE Marks") (*Id. ¶¶* 39-40.) The SOUND CHOICE Marks are registered in International Class 9 for use on "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." *See* http://tarr.uspto.gov/servlet/tarrregser=serial&entry =74561912 (listing use of SOUND CHOICE on "pre-recorded magnetic audio cassette tapes and compact discs containing compositions and compact discs containing video related to musical compositions"); http://tarr.uspto.gov/servlet/tarrregser=serial&entry=74627124 (listing use of SOUND CHOICE on "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions.")

The Defendant has contracted with one or more suppliers known as karaoke operators ("KJs"), provide karaoke entertainment shows at the Defendant's establishment. (*Id.* ¶51). These karaoke shows consist of participatory entertainment, in which individual patrons or groups of patrons sing popular songs while accompanied by recorded accompaniment music. (*Id ¶*52*)* Each song within the recorded accompaniment music, together with graphical displays of the lyrics and other material synchronized to the music, is a "karaoke accompaniment track." (*Id.* ¶ 54.) Slep-Tone alleges that, "With respect to Defendant's establishment(s), a substantial portion of the content represented on the karaoke accompaniment tracks used to put on the karaoke shows was created by Plaintiff." (*Id.* ¶ 55). Plaintiff's further allege that, "the Plaintiff did not create the karaoke accompaniment track actually used by the karaoke operators. Rather, the karaoke operator(s) either made the tracks themselves by duplicating them from an original or

non-original source or acquired the tracks from another person who duplicated or derived them from an original or non-original source." (*Id.* ¶ 56-57).

Slep-Tone alleges in a conclusory fashion that the karaoke operators:

a) "were not authorized use the Sound Choice Marks or apply the Sound Choice Marks to any product, including to any karaoke accompaniment track;" (*Id.* ¶58).

b) "were not authorized to obtain or use duplicates of the Plaintiff's karaoke accompaniment tracks;" (*Id* ¶59).

c) "did not pay royalties or fees to the Plaintiff or to upstream owners of copyright in the underlying musical works for the privilege of conducting their duplicative activities." (*Id.* ¶ 60).

Slep-Tone alleges that, "The activities of the Defendants are of a commercial nature, in that the acts were principally motivated by the transfer of money by, between, and among the various participants in the karaoke shows in connection with the services being provided." (*Id.* ¶ 70). Slep-Tone further alleges that, "The Defendant has the right and ability to control whether its contractor(s) uses authentic or counterfeit materials to provide services." (*Id.* ¶ 73).

## **LEGAL STANDARD**

"In ruling on Rule 12(b)(6) motions, the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re march FIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009) (citing *Tamayo*, 526 F.3d at 1081). Conclusory allegations are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868, 885 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). To state a claim upon which relief can be granted, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to

4

relief." Fed.R.Civ.P. 8(a)(2). That statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, 940 (2007). This means that (1) "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests'" and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level." *EEOC v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir.2007).

Although detailed factual allegations are not required for a complaint to pass muster under Rule 12(b)(6), the factual allegations "must be enough to raise a right to relief above the speculative level…." *Twombly*, 550 U.S. at 555. The pleading must convince the court that the facts provide more than "a suspicion [of] a legally cognizable right of action." *Id.* Thus, "[w]here a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 557. Courts considering a motion to dismiss should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of trust; while legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1940.

# ARGUMENT AND MEMORANDUM OF LAW

I. TRADEMARK LAW MAY NOT BE EXTENDED INTO AREAS CONTROLLED BY COPYRIGHT.

A. <u>Dastar Prohibits Extending Lanham</u>

In *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23 (2003), the United States Supreme Court was presented with facts as follows:

> In 1948, three and a half years after the German surrender at Reims, General Dwight D. Eisenhower completed Crusade in Europe, his written account of the allied campaign in Europe during World War II. Doubleday published the book, registered it with the Copyright Office in 1948, and granted exclusive television rights to an affiliate of respondent Twentieth Century Fox Film Corporation (Fox). Fox, in turn, arranged for Time, Inc., to produce a television series, also called Crusade in Europe, based on the book, and Time assigned its copyright in the series to Fox. The television series, consisting of 26 episodes, was first broadcast in 1949. It combined a soundtrack based on a narration of the book with film footage from the United States Army, Navy, and Coast Guard, the British Ministry of information and War Office, the National Film Board of Canada, and unidentified "Newsreel Pool Cameramen." In 1975, Doubleday renewed the copyright on the book as the "'proprietor of copyright in a work made for hire.'" . . . Fox, however, did not renew the copyright on the Crusade television series, which expired in 1977, leaving the television series in the public domain.
>
> In 1988, Fox reacquired the television rights in General Eisenhower's book, including the exclusive right to distribute the Crusade television series on video and to sub-license others to do so. Respondents SFM Entertainment and New Line Home Video, Inc., in turn, acquired from Fox the exclusive rights to distribute Crusade on video. SFM obtained the negatives of the original television series, restored them, and repackaged the series on videotape; New Line distributed the videotapes.

> Enter petitioner Dastar. In 1995, Dastar decided to expand its product line from music compact discs to videos. Anticipating renewed interest in World War II on the 50th anniversary of the war's end, Dastar released a video set entitled World War II Campaigns in Europe. To make Campaigns, Dastar purchased eight beta cam tapes of the *original* version of the Crusade television series, which is in the public domain, copied them, and then edited the series. Dastar's Campaigns series is slightly more than half as long as the original Crusade television series. Dastar substituted a new opening sequence, credit page, and final closing for those of the Crusade television series; inserted new chapter-title sequences and created chapter introductions; moved the "recap" in the Crusade television series to the beginning and retitled it as a "preview"; and removed references to and images of the book. Dastar created new packaging for its Campaigns series and (as already noted) a new title.
>
> Dastar manufactured and sold the Campaigns video set as its own product. The advertising states: "Produced and Distributed by: *Entertainment Distributing"* (which is owned by Dastar), and makes no reference to the Crusade television series. Similarly, the screen credits state "DASTAR CORP presents" and "an ENTERTAINMENT DISTRIBUTING Production," and list as executive producer, producer, and associate producer, employees of Dastar. . . . The Campaigns videos themselves also make no reference to the Crusade television series, New Line's Crusade videotapes, or the book. Dastar sells its Campaigns videos to Sam's Club, Costco, Best Buy, and other retailers and mail-order companies for $25 per set, substantially less than New Line's video set.

*Dastar,* 539 U.S. at 25-27 (emphasis original; citations to the record omitted). *Dastar* respondents Fox, SFM, and New Line brought copyright and Lanham Act claims against Dastar, their Lanham Act claims being premised on the theory that the failure to attribute the origin of Dastar's Campaigns video in the Time Crusade in Europe television series was a

7

form of "reverse passing off" in violation of Section 43(a) of the Lanham Act. *See id.* at 27. The *Dastar* court roundly rejected the respondents' theory that the Lanham Act's prohibition of any "false designation of origin" requires attribution to the holder of rights in a work of intellectual property; while Slep-Tone's claims do not depend in any respect on the validity of the *Dastar* respondents' rejected theory, the court's reasoning nevertheless provides guidance material to the issues now before this court.

> The *Dastar* court began its analysis by re-affirming the longstanding proposition that the

Lanham Act cannot properly be construed as providing protections of the same nature as those provided by copyright or patent law:

> The problem with [interpreting Section 43(a) to require attribution to the author of a trademarked work of intellectual property] is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically. **The right to copy, and to copy without attribution, once a copyright has expired, like "the right to make an article whose patent has expired--including the right to make it in precisely the shape it carried when patented--passes to the** public." *Sears, Roebuck & Co. v. Stijfel Co.,* 376 U.S. 225, 230, 11 L. Ed. 2d 661, 84 S. Ct. 784, 1964 Dec. Comm'r Pat. 425 (1964); *see also Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 121-122, 83 L. Ed. 73, 59 S. Ct. 109, 1939 Dec. Comm'r Pat. 850 (1938). "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 149 L. Ed. 2d 164, 121 S. Ct. 1255 (2001). The rights of a patentee or copyright holder are part of a "carefully crafted bargain," *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 150-151, 103 L. Ed. 2d 118, 109 S. Ct. 971 (1989),

under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution. Thus, in construing the Lanham Act, we have been "careful to caution against misuse or over-extension" of trademark and related protections into areas traditionally occupied by patent or copyright. *TrafFix,* 532 U.S., at 29, 149 L Ed 2d 164, 121 S Ct 1255. *Id.* at 33-34 (emphasis supplied; internal modifications omitted).

The court specifically noted that:

"The Lanham Act...does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *[TrafFix,* 532 U.S.] at 34.... Federal trademark law "has no necessary relation to invention or discovery," *Trade-ll/ark Cases,* 100 U.S. 82, 94, 25 L. Ed. 550, 1879 Dec. Comm'r Pat. 619 (1879), but rather, by preventing competitors from copying "a source-identifying mark," "reduces the customer's costs of shopping and making purchasing decisions," and "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product," *Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 163-164, 131 L. Ed. 2d 248, 115 S. Ct. 1300 (1995) (internal quotation marks and citation omitted). Assuming for the sake of argument that Dastar's representation of itself as the "Producer" of its videos amounted to a representation that it originated the creative work conveyed by the videos, allowing a cause of action under §43(a) for that representation would create a species of mutant copyright law that limits the public's "federal right to 'copy and to use,'" expired copyrights, *Bonito Boats, supra,* at 165, 103 L Ed 2d 118, 109 S Ct 971. *Id.* at 34 (emphasis supplied).

The *Dastar* court expressly cautioned against "reading §42(a) of the Lanham Act as creating a cause of action for, in effect, plagiarism – the use of otherwise unprotected works and inventions without attribution," id. at 36, and "reading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which

9

*were),"* id. at 37 (emphasis original), ultimately concluded that the respondents' claims would not lie under the Lanham Act. The *Dastar* court thus found the respondents' theory incorrect as a matter of law chiefly and specifically (albeit among other reasons not discussed in detail herein) because their interpretation would permit trademark rights to be enforced to prohibit the public from copying and using intellectual property, which is beyond the scope of trademark law. Although the *Dastar* court addressed the scenario in which respondents sought to use their extant trademark rights to substitute for their *expired* copyright interests, the court's reasoning naturally applies with equal force where the claimant possesses both valid trademark rights *and* valid copyright interests, but for reasons of its own elects not to enforce its copyright: either in the absence of an enforceable copyright or where a copyright-holder elects not to invoke its copyright, under *Dastar* the protections of the Lanham Act cannot be construed as "dropping down" to provide protection exclusively available under copyright law.

The Seventh Circuit explained the *Dastar* decision as follows:

Dastar thus had the right (so far as the Lanham Act is concerned) to incorporate into its videos footage taken and edited by others, provided that it manufactured the finished product and did not mislead anyone about who should be held responsible for shortcomings. No one makes a product from scratch, with trees and iron ore entering one end of the plant and a finished consumer product emerging at the other. Ford's cars include Fram oil filters, Goodyear tires, Owens-Corning glass, Bose radios, Pennzoil lubricants, and many other constituents; buyers can see some of the other producers' marks (those on the radio and tires for example) but not others, such as the oil and transmission fluid.

*Bretford Mfg.,* 419 F.3d at 580. The *Bretford Mfg.* court thus instructs that the pertinent inquiry under *Dastar* is "whether the consumer knows who produced the finished product," even if "most of the product's economic value came from elsewhere." *Id.* the Lanham Act does not include any version of the "derivative work" right in copyright law. See 17 U.S.C. § 106(2). *Id.* at 581. The Lanham Act does not protect originality or creativity, the Copyright Act does. *Dastar* at 37.

B.  The Tracks At Issue Were Made By Slep-Tone

The root of the problem, according to the Complaint, are karaoke tracks on played by KJs at Defendant's restaurant displayed the Sound Choice trademark when played. But, it was Slep-Tone that put the Sound Choice mark in their tracks. Slep-Tone does not allege that someone else recorded karaoke tracks and marked them with the Sound Choice trademark. Slep-Tone alleges that karaoke tracks were created by Slep-Tone. (*See* Amended Compl. 55) That is, Defendant's contractors allegedly have karaoke tracks that were produced, recorded, and mastered by Slep-Tone. Copies of tracks produced, recorded, and mastered by Slep-Tone do not merely look and sound like Slep-Tone's tracks; they are not imitations of Slep-Tone's tracks; they *are* Slep- Tone's tracks. Most importantly, Plaintiff does not ever even allege that any of the tracks or equipment in any way belong to the Defendants.

C.  Slep-Tone Misuses The Term "Counterfeit"

Slep-Tone misuses the term "counterfeit," as illustrated by the distinctions drawn in *Microsoft Corp. v. Action Software*, 136 F. Supp. 2d 735 (N.D. Ohio 2001).

Two kinds of software were at issue in *Action Software*: counterfeit software (software that Microsoft did not manufacture, but which appeared to be and was held out to be Microsoft merchandise), and unauthorized copies of Fulfillment software (software manufactured by Microsoft intended for business customers with a pre-existing volume license that allowed the business to install Microsoft software on all of its computers but was not authorized for resale). *Id*. at 736. At times Microsoft referred to both types of software as "counterfeit." The court took exception to the unauthorized copies of Fulfillment software being labeled as "counterfeit."

> Microsoft has, at times, alleged that any software . . . that Microsoft does not authorize for sale, is "counterfeit" software—even though that software was actually created and manufactured by Microsoft. The Court defines "counterfeit" more narrowly, using its dictionary definition; "counterfeit" properly is that which is "made in imitation with intent to deceive." In other words, counterfeit software meant to look and perform like Microsoft software, but not actually designed, manufactured or created by Microsoft.

*Id.* at 738 N.2 (quoting *Random House College Dictionary* 306 (1st ed. 1980)).

The tracks alleged to be used are not counterfeit, just like the unauthorized copies of Microsoft's Fulfillment software are not counterfeit. Counterfeits are imitations of the real thing made to deceive consumers into believing that they are the real thing, such as a CARTIER mark on "fake CARTIER watches made with inferior parts," or a LEVI'S mark on "imitation LEVI's jeans [that] may fall apart after one washing." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:10 (4th ed. 2013). If someone other than Slep-Tone had recorded a karaoke track and put the Sound Choice mark on the tracks—that would be a counterfeit—an imitation of the real thing made to deceive customers into believing that it is the real thing made by Slep-Tone. A copy (no matter how degraded) of a karaoke track produced, recorded, and mastered by Slep-Tone is not a counterfeit. It was actually created and manufactured by Slep-Tone.

This case does not involve imitations of Slep-Tone's tracks on which someone placed the Sound Choice trademark. As its complaint makes clear, Slep-Tone asserts that these are karaoke tracks made by Slep-Tone.

D. The Alleged Bad Act Is Public Display Of An Audiovisual Work

All of Slep-Tone's allegations of bad acts boil down to one thing—alleged customer confusion that occurs when KJs play Slep-Tone's karaoke tracks in public. According to Slep-Tone: "With respect to the Defendants' establishment, a substantial

portion of the content represented on the karaoke accompaniment tracks used to put on the karaoke shows was originally created by the Plaintiff. (Am. C ¶ 55); "The karaoke operator(s) were not authorized to obtain or use duplicates of the Plaintiff's karaoke accompaniment tracks." (*id*. at ¶ 59); and Defendants did not pay royalties or fees to Plaintiff or to upstream owners of copyright in the underlying musical works for the privilege of conducting their duplicative activities. (*id*. at ¶ 60).

Each of the alleged acts amount to playing a karaoke track in public. In other words, the alleged wrongful act is public performance of an audiovisual work.

    a. Public Display is not Actionable Under Trademark

Whether one may publicly display an audiovisual work is a monopoly right held by the owner of a copyright. 17 U.S.C. § 106(5) ("[T]he owner of copyright under this title has the exclusive rights to do and authorize any of the following: . . . in the case of . . . audiovisual works, to perform the copyrighted work publicly…."). Because this monopoly right exists in copyright law, it cannot also exist in trademark law. *Dastar*, 539 U.S. at 33-34. "To hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do." *Id*. at 37.

Slep-Tone's allegation that Defendants contractors played its karaoke tracks in public does not support an action in trademark infringement. Indeed, unless Slep-Tone has a valid copyright in Slep-Tone's karaoke tracks, they are in the public domain, and Defendants and their contractors have a federal right to freely play Slep-Tone's karaoke tracks. *See id*. at 33 ("In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying."); *id*. at 34 (holding the public has a "federal right to copy and to use" items not protected by copyrights).

13

## II. THE COMPLAINT FAILS TO STATE A CLAIM FOR UNFAIR COMPETITION AND SHOULD BE DISMISSED.

Count II of the Complaint purports to allege a cause of action for unfair competition under the Lanham Act. "When trademark and unfair competition claims are based on the same [allegedly] infringing conduct, courts apply the same analysis to both claims." *Toho Co., Ltd. V. William Morrow and Company, Inc.,* 33 F. Supp. 2d 1206, 1210 (C.D. Cal. 1998) ( citing *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 128 n.2 (9th Cir. 1992)). Count II is based upon the same allegedly infringing conduct as Count I. Accordingly, because Slep-Tone has failed to state a claim for trademark infringement, it has also failed to state a claim for unfair competition and the Complaint should be dismissed.

## III. THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF UNDER THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT.

The Seventh Circuit has not addressed this question. However, recent district court decisions within this circuit which have analyzed whether the federal copyright law preempts a claim under the Illinois UDPTA have held that the inherent misrepresentation that accompanies the unauthorized copying and reproduction of another's copyrighted work in a reverse passing off case without more is not enough to constitute a cause of action under the UDTPA. *See Marobie-Fl, Inc. v. Nat'l Assoc. of Fire Equip. Distributors of Northwest Nexus, Inc., 983 F. Supp.* 1167, 1180 (N.D. Ill. 1997); *Balsamo/Olson Group v. Bradley Place Ltd. Partnership*, 950 F. Supp. 896, 898 (C.D. Ill. 1997); *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334, 1362 (N.D. Ill. 1994). We recognize that the federal copyright law has a specific preemption provision for state causes of action and, therefore, that the courts' opinions in these cases fall under that section. However, the federal cause of action for reverse passing off under Section 1125 (a) is no

different in its requisite elements than a state cause of action for unfair competition under the UDPTA. *Pesina v. Midway Mfg Co.*, 948 F. Supp. 40, 42 (N.D. Ill. 1996). Accordingly, because Slep-Tone has essentially alleged all of the same facts as in the second count of the Complaint, it has failed to state a claim for relief under the Illinois Deceptive Trade Practices Act and the Complaint should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Defendant, Sellis Enterprises Inc., respectfully requests that the dismiss the Complaint and for any and all actions that this Court deems fair and just.

Dated this 17th day of October, 2014.

The Law Offices of Matthew M. Saffar, LLC


By:   /s/Matthew M. Saffar
Matthew M. Saffar (Illinois Bar No. 6295406)
800 E. Northwest Highway, Suite 1095
Palatine, IL 60074
Tel: (847)259-6647
Fax: (847)259-6652
Email: saffarlaw@gmail.com
Attorney for Defendants Sellis Enterprises Inc. and Susan Sellis

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on this 17th day of October, 2014, he electronically filed **Defendants' Motion to Dismiss,** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Vivek Jayaram
Johanna Stein
Jayaram Law Group
33 N. LaSalle St., Suite 2900
Chicago, IL 60602

/s/ Matthew M. Saffar