UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | No. 13 C 08070 |
| v. | ) ) | Judge Edmond E. Chang |
| SELLIS ENTERPRISES, INC. d/b/a ROCKY VANDERS CAFÉ & BAR and SUSAN SELLIS, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Slep-Tone Entertainment Corporation brings this suit for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125, and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.*[1] Slep-Tone alleges that Susan Sellis, through the bar that she owns, knowingly used unauthorized recreations of its karaoke tracks, causing confusion and leading to financial loss (for convenience's sake, Defendants will be referred to as just Sellis). Sellis has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Slep-Tone's claims are precluded by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). R. 51, Defs.' Mot. Dismiss. For the reasons stated below, Sellis's motion to dismiss is denied.

---

[1]This Court has subject matter jurisdiction over Lanham Act claims under 28 U.S.C. § 1331 (federal-question jurisdiction) and 15 U.S.C. § 1121. The Court also exercises supplemental jurisdiction over Slep-Tone's state-law claim under 28 U.S.C. § 1367.

1

## I. Background

For the purposes of evaluating the motion to dismiss, the Court must accept the complaint's factual allegations as true and draw reasonable inferences in Slep-Tone's favor. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011).

### A. Slep-Tone's Products and Trademarks

Slep-Tone produces karaoke accompaniment tracks for about 18,000 popular songs. R. 50, First Am. Compl. ¶ 10.[2] It has invested more than $18 million in this enterprise, seeking to produce the highest quality and most authentic tracks. *Id.* ¶¶ 10-11. According to the amended complaint, this effort has led to Slep-Tone's "SOUND CHOICE" label being one of the most recognizable in the industry. *Id.* ¶ 11. Slep-Tone releases its commercial products exclusively on physical media, including compact discs. *Id.* ¶ 12. The karaoke tracks are encoded on these CDs in a format known as CD+G (compact disc plus graphics), which allows for playback of the audio track with the visual lyrical cues simultaneously. *Id.* ¶ 13.

Slep-Tone has registered four marks in connection with its production of karaoke accompaniment tracks: two trademarks and their related service marks. *Id.* ¶¶ 39-42. The first trademark, with Registration No. 1,923,448, protects the "SOUND CHOICE" mark for cassette tapes and CDs containing musical compositions and the related video. *Id.* ¶ 39. The related service mark, with Register No. 4,099,045, protects "SOUND CHOICE" for exhibitions at karaoke shows. *Id.* ¶ 40. The second trademark, with Registration No. 2,000,725, protects the display mark for cassette tapes and CDs containing musical compositions and

---

[2]Citations to the docket are indicated as "R." followed by the entry number.

the related video. *Id.* ¶ 41. The display mark is reproduced below:



This display mark has a related service mark, with Registration No. 4,099,052, which protects the mark for exhibitions at karaoke shows. *Id.* ¶ 42.

According to Slep-Tone, these marks signify to the public that Slep-Tone is the origin of the karaoke accompaniment tracks and that any track that displays the marks was created by Slep-Tone or under its direction and control. *Id.* ¶ 44. Slep-Tone's trade dress, which includes its registered marks, serves the important purpose of distinguishing Slep-Tone's tracks from those of its competitors. *Id.* ¶ 48.

### B. Sellis's Replication and Use of Slep-Tone's Tracks

The advent and increased use of computer technology has allowed for karaoke tracks to be "ripped" from their CD+G hard media to computer hard drives. *Id.* ¶ 15. Any copy not stored on the original CD is known as a "media-shifted" copy because it has been written onto non-original media. *Id.* ¶ 16. This media shifting often involves accompanying format shifting, for example a change from CD+G to MP3+G. *Id.* ¶ 17. Most karaoke operators now use media and format-shifted tracks to avoid the burden of carrying an extensive CD library. *Id.* ¶¶ 18-19. Karaoke operators have also started to use the ability to media- and format-shift for more dubious purposes—they are able to copy one purchased CD onto two or more computer systems, to obtain tracks via file sharing, to purchase hard drives pre-loaded with karaoke tracks, or to sell the CDs on a secondary market after copying

them to their computers. *Id.* ¶ 21. These activities allow the operator to have access to more music than he or she paid for, or to avoid paying for the tracks altogether. *Id.* ¶ 20.

Sellis owns and operates a bar in Prospect Heights, Illinois, and she has contracted with several karaoke operators to put on shows in which patrons participate in the performance of a song using an accompaniment track. *Id.* ¶¶ 7-9, 51-52. The karaoke operators have used tracks displaying the Sound Choice marks; either the operators made the tracks themselves or duplicated them from another original or non-original source. *Id.* ¶¶ 57-58, 64-65. Slep-Tone did not authorize the duplication of the tracks and Sellis did not pay any royalties for the display of Slep-Tone's marks. *Id.* ¶¶ 61, 66. Because there was no authorization, Slep-Tone was also unable to oversee the quality of the duplicate tracks. *Id.* ¶ 66. This lack of oversight led to the production of tracks that were degraded from their original quality. *Id.* ¶ 67.

Slep-Tone told Sellis that her karaoke contractors were infringing on Slep-Tone's trademarks and offered her the opportunity to enter into a "Safe Harbor Program" that protects venues from liability in exchange for requiring their contractors to provide information about their karaoke systems. *Id.* ¶¶ 74-75. Alternatively, Slep-Tone offered a certification program that allows a venue to determine whether a particular karaoke operator is using authentic materials. *Id.* ¶ 76. Sellis has not entered into these programs or stopped using the services of any of the allegedly infringing contractors. *Id.* ¶ 78.

Slep-Tone alleges that Sellis has benefitted from the karaoke operators' use of pirated tracks. *Id.* ¶ 79. These contractors can afford to charge a lower fee to put on karaoke shows, because they paid less money (or no money at all) for the tracks that they use, and they can pass those savings along to Sellis. *Id.* ¶¶ 86-88. Use of media-shifted tracks has also harmed Slep-Tone, which has lost significant sales of its karaoke tracks. *Id.* ¶ 90. To combat the use of the media-shifted karaoke accompaniment tracks, Slep-Tone filed this lawsuit seeking an injunction and damages in excess of $100,000. *Id.* at Prayer for Relief. Defendants now move to dismiss, arguing that Slep-Tone cannot state a claim for relief under the Lanham Act or the Illinois Uniform Deceptive Trade Practices Act. *See* Mot. Dismiss.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

5

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly,* 550 U.S. 544, 570 (2007)). The allegations "must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, and are entitled to an assumption of truth so long as they are *factual* in nature, rather than mere *legal* conclusions. *Iqbal,* 556 U.S. at 678-79.

### III. Analysis

Slep-Tone brings this lawsuit under the Lanham Act, alleging both trademark infringement and unfair competition based on Sellis's knowing use of media-shifted Slep-Tone tracks. *Id.* ¶¶ 95-115. It also alleges unfair competition under the Illinois Uniform Deceptive Trade Practices Act based on the same conduct. *Id.* ¶¶ 116-23. Sellis has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Defs.' Mot. Dismiss at 1. She devotes the majority of her motion to the argument that Slep-Tone's claims are improperly brought under the Lanham Act and are barred by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp. See* Defs.' Mot. Dismiss at 6-10. Sellis also makes additional arguments on the various elements of Slep-Tone's Lanham Act claim, citing Slep-Tone's alleged failure to plead use in commerce and likelihood of confusion. *See* R. 58, Defs.' Reply Br. at 3-4.

6

All three counts of Slep-Tone's complaint are based upon the same conduct, and Sellis's arguments for dismissal are essentially identical on each count. *See* First Am. Compl. ¶¶ 51-94; Defs.' Mot. Dismiss at 14-15. This makes sense, because claims of trademark infringement and unfair competition under the Lanham Act based on the same conduct are evaluated under the same standard. *See Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) (citing *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997)) (noting that the same analysis that governs trademark infringement applies to unfair competition under the Lanham Act). Lanham Act claims and claims under the Illinois Uniform Deceptive Practices Act are similarly subject to the same standard. *See TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997) ("[F]ederal and state laws regarding trademarks and related claims of unfair competition are substantially congruent.") (internal quotation marks omitted); *Thompson v. Spring-Green Lawn Care Corp.*, 466 N.E.2d 1009, 1015-16 (Ill. App. Ct. 1984) ("[C]ourts apply a single analysis to federal, state and common law [trademark] claims."). The analysis of the trademark infringement claim under the Lanham Act will therefore control the resolution of the remaining claims.

### A. *Dastar*

Sellis argues that the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.* bars Slep-Tone's Lanham Act claim. Defs.' Mot. Dismiss at 2, 12-13. Because *Dastar* holds that the Lanham Act does not "creat[e] a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and

7

inventions without attribution," *Dastar*, 539 U.S. at 36, Sellis argues that Slep-Tone cannot bring a Lanham Act claim premised on unauthorized performance of its karaoke tracks. Defs.' Mot. Dismiss at 6-13. If Slep-Tone wanted to redress these unauthorized performances, Sellis argues, it would have to do so under copyright law. *Id.*

Sellis's argument misunderstands *Dastar*'s holding and its application to Slep-Tone's complaint. In *Dastar*, the Supreme Court evaluated whether the Lanham Act prevents unaccredited copying of a work. 539 U.S. at 25. Dastar, the defendant in that case, created a video series called "World War II Campaigns in Europe" (Campaigns) based on a previously produced television series produced by Time, Inc. under the title "Crusade in Europe" (Crusade). *Id.* at 25-26. The original series, based on a book of the same name by General Dwight D. Eisenhower, was produced using film footage from the United States Armed Forces, the British Ministry of Information and War Office, the National Film Board of Canada, and several unidentified "Newsreel Pool Cameramen." *Id.* at 25-26. Dastar, "[a]nticipating renewed interest in World War II on the 50th anniversary of the war's end," bought copies of Crusade and edited the footage to make its series, Campaigns. *Id.* at 26. Dastar marketed the Campaigns video series as its own product, making no reference to the original Crusade series. *Id.* at 27. It substituted its own opening and title sequences, removed references to and images of the book, included its name as the producer in the credits, and listed employees of Dastar as executive producer, producer, and associate producer. *Id.* at 26-27. Fox and the

8

other plaintiffs brought suit, alleging (among other things) that Dastar's sale of the Campaign series without proper credit to Crusade constituted reverse passing off[3] under § 43(a) of the Lanham Act. *Id.* at 27.

The Supreme Court rejected Fox's trademark claim, reasoning that the Fox relied on a faulty definition of "origin" of goods found in the Lanham Act. *See id.* at 31. Under § 43(a) of the Lanham Act, a person may not use a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact" in connection with any "goods or services." 15 U.S.C. § 1125(a). Fox argued that, because Dastar marketed the repurposed Crusade footage as its own, it had misrepresented the origin of the footage. *Dastar*, 539 U.S. at 28. The Court disagreed. The Court held that "origin" as used in § 43(a) means the producer of the *tangible goods* sold in the marketplace, not the person or entity that came up with the original ideas that the goods contain. *Id.* at 31-32. If the latter formulation were allowed, the trail of origin would be unmanageably long. Indeed, Fox was merely licensed to distribute the video, which Time, Inc. actually created; but neither entity shot the footage that was used. The footage came from various branches of the United States Armed Forces, the British Ministry of Information and War Office, the National Film Board of Canada, and unidentified "Newsreel Pool Cameramen." *Id.* at 35. To allow the meaning of "origin" to stretch back to the creators of the video's content would result in a limitless search for "the Nile and all its tributaries."

---

[3]The converse of typical "passing off" claims, in which "the plaintiff complains that the defendant is passing off his (inferior) product as the plaintiff's," "reverse passing off" occurs when the "defendant is trying to pass off the plaintiff's product as the defendant's." *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 987 (7th Cir. 2004).

*Id.* at 36. This type of protection, for the actual "creative talent" behind the Campaigns series, would have found ample protection in the world of copyright. *Id.* at 37-38.

At oral argument, the Supreme Court suggested that if "Dastar had simply 'copied [the television series] as Crusade in Europe and sold it as Crusade in Europe,' without changing the title or packaging (including the original credits to Fox)" it would be hard to imagine that there would not be Lanham Act claim. *Id.* at 36 (quoting Tr. Of Oral Arg. 35) (alteration in original). This discussion highlights the crucial distinction between the producer of the goods and the holder of the associated mark. Based on the actual facts before the Supreme Court, Dastar was the producer of the physical good (the Campaign series) and Dastar's marks were applied to those goods. *Id.* at 27. Because the producer and the mark-holder matched, Fox could not bring a Lanham Act claim. *See id.* at 28. By contrast, the Supreme Court's hypothetical suggests a scenario in which Dastar produced a new good (an exact copy of the Crusade series) and applied Fox's mark. In such a situation the producer and the mark-holder do *not* match and there would be a potential Lanham Act claim.

It is on this point—origin of goods—that Sellis's characterization of Slep-Tone's complaint misses the mark. In the first instance, Sellis argues that the copies of Slep-Tone's original tracks are, in essence, the same as Slep-Tone's tracks. Defs. Mot. Dismiss at 11. In the context of *Dastar*, the thrust of this argument is that Slep-Tone cannot have alleged a Lanham Act violation where Slep-Tone's own

10

mark is applied to its own original goods. But Sellis's argument ignores a significant portion of Slep-Tone's complaint—it claims that karaoke operators engage in media and format shifting, creating tracks on both a new hard medium and in a completely new format.[4] First Am. Compl. ¶¶ 15-19. The media and format shifting operates as an independent creation event, placing a new "good" in the marketplace.

To be sure, the application of this principle might seem unclear in the context of CD to MP3 format shifting, because a replica of the original (or something close to a replica) is shifted onto a new media or into a new format. But consider this tangible example, rooted in the similar facts of *Dastar*: if an individual were to take a Slep-Tone CD and copy the tracks onto another CD, it is difficult to dispute that a new good has been made, a good that Slep-Tone did not create. The same was true in *Dastar*: just as making an exact copy of Fox's Crusade series would have made Dastar the originator of a new tangible product sold in the marketplace, *Dastar*, 539 U.S. at 36, the media-shifter making an exact copy of Slep-Tone's tracks is the originator of a new tangible product in the market place. So even if Sellis is correct in asserting that the copied tracks are identical to the original tracks, media- and format-shifting creates a new tangible good of which Slep-Tone is *not* the original producer. Because the producer of the new good (karaoke jockeys) and the mark-

---

[4]The use of digital media in this case does not change the impact of *Dastar*. Although the Supreme Court did use the phrase "tangible good," which could suggest that a *physical* product is necessary, "the *Dastar* opinion … makes clear that the Court used that language simply to distinguish goods and products offered for sale (which receive Lanham Act protection) from any 'idea, concept, or communication embodied in those goods' (which are protected only by copyright laws)." *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936 (E.D. Va. 2010). Moreover, the regulations associated with the Lanham Act interpret "goods" to include "magnetic data carriers, recording discs, compact discs … and other digital recording media [and] … computer software." 37 C.F.R. § 6.1(9).

11

holder of the mark on the goods (Slep-Tone) do not match, the alleged use of Slep-Tone's mark on the copied tracks is a false designation of origin covered by the Lanham Act.[5]

Sellis offers a second argument based on the reasoning of *Dastar*. Sellis asserts that Slep-Tone's only claim for damage results from the public performance of an audiovisual work. Defs.' Mot. Dismiss at 13. Sellis is correct that the public display of an audiovisual work is protected under copyright law. 17 U.S.C. § 106(5). Sellis is also correct that the protection of the "author of any idea, concept, or communication" would be akin to finding a perpetual copyright in the Lanham Act, which Congress is not allowed to do. *Dastar*, 539 U.S. at 37. But Sellis again miscomprehends Slep-Tone's complaint. Slep-Tone alleged that it "did not create the accompaniment tracks actually used by the karaoke operator(s)." First Am. Compl. ¶ 56. Slep-Tone next claims that the karaoke operators were not allowed to apply its marks to those tracks and that Sellis was not authorized to create or use accompaniment tracks that bear the SOUND CHOICE mark. *Id.* ¶¶ 58, 65. These allegations detail allegedly infringing conduct beyond public performance of an

---

[5]Even if simply copying a good did not create a new good for the purposes of the Lanham Act (a result that would contradict *Dastar*), Slep-Tone would still have plausibly stated a claim for relief. Ordinarily, trademark law does not protect against the sale of genuine goods bearing a true mark even when the sale is not authorized by the mark owner. *Slep-Tone Entm't Corp. v. America's Bar & Grill, LLC*, 2014 WL 4057442, at *3-4 (N.D. Ill. Aug. 15, 2014) (citing *Standard Process, Inc. v. Banks*, 554 F. Supp. 2d 866, 869 (E.D. Wis. 2008)). That rule, however, does not apply to trademarked goods that are "materially different than those sold by the trademark owner." *Id.* (citing *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995); *SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1092 (C.D. Cal. 2001)). Slep-Tone alleges that the media- and format-shifted tracks are degraded in quality. First Am. Compl. ¶ 67. At this stage, Slep-Tone's allegation of degraded quality would be sufficient to raise an inference that the media-shifted tracks were materially different from the original goods.

audiovisual work.[6] Slep-Tone is alleging that a producer of a good—the media-shifted karaoke track—applied Slep-Tone's SOUND CHOICE mark to that track without authorization. These allegations state a Lanham Act violation. The motion to dismiss based on the Supreme Court's decision in *Dastar* is therefore denied.

### B. Sellis's Other Arguments

Sellis mounts two additional attacks on the sufficiency of Slep-Tone's complaint. First, Sellis suggests that the karaoke tracks have not been used in commerce, as required under the Lanham Act. Defs.' Reply Br. at 4. Sellis argues, without citation, that because Sellis never engaged in a sale of the karaoke tracks, Sellis did not use them in commerce. *Id.* Sellis over-simplifies the commerce analysis. In order to satisfy the use-in-commerce requirement, the infringing acts need not have actually taken place in commerce—they need only have an adverse effect on commerce. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 427 (9th Cir. 1977); *see also Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 713-14 (N.D. Ill. 2014); *Slep-Tone Entm't Corp. v. Elwood Enters., Inc.*, 2014 WL 1612891, at *2-3 (N.D. Ill. Apr. 21, 2014). To that end, the use-in-commerce element is satisfied if a defendant uses a plaintiff's mark for the purpose of providing a service. 15 U.S.C. § 1127 ("[A] mark shall be deemed to be in use in commerce … on services when it is used or displayed in the sale or advertising of services and the services

---

[6]Adding force to Slep-Tone's complaint is the specific caveat that Slep-Tone does not own the underlying copyright and in fact Slep-Tone pays royalties for the use of the songs. First Am. Compl. ¶ 29. In this way, Slep-Tone distances itself from the underlying artistic work. Its claims do not stem from a desire to protect creativity; rather, the complaint alleges a misapplication of Slep-Tone's mark to goods that Slep-Tone did not create.

13

are rendered in commerce."); *see also Valley Forge Military Acad. Found. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 456 (E.D. Pa. 2014).

In this case, Slep-Tone makes sufficient allegations of an adverse impact on commerce. First, Slep-Tone pleads that Sellis reaped substantial revenue from "sale[s] of concessions" during the time that its marks were improperly displayed. First Am. Compl. ¶ 68. Next, Slep-Tone alleges that Sellis's acts were primarily profit-motivated and karaoke participants engaged in "the transfer of money" in connection with the karaoke shows. *Id.* ¶ 70. That is, Sellis uses the karaoke shows (and the Slep-Tone-marked tracks) to bring customers into the bar, and those customers purchase food and drinks. Sellis has also financially benefited from obtaining the services of karaoke operators at below-market prices, since the use of media-shifted tracks allows the karaoke jockeys to work with lower operating costs—savings that have been passed on to Sellis. *Id.* ¶¶ 86-89. These facts, taken together, are enough to plausibly plead use in commerce.

Finally, Sellis asserts that Slep-Tone has failed to sufficiently plead likelihood of confusion, also required under the Lanham Act. Defs.' Mot. Dismiss at 12; Defs.' Reply Br. at 3. In order to prove likelihood of confusion, courts balance seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to 'palm off' his product as that of the plaintiff." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267

F.3d 660, 677-78 (7th Cir. 2001) (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897-98 (7th Cir. 2001)). "None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir. 1988) (citation omitted). But similarity of the marks, a defendant's intent, and actual confusion are often particularly important in establishing likelihood of confusion. *CAE*, 268 F.3d at 678. Generally, likelihood of confusion "is a fact-specific inquiry best left for decision after discovery." *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008). So at the motion-to-dismiss stage, the plaintiff only needs to allege facts that could, after drawing reasonable inferences in plaintiff's favor, plausibly support the likelihood-of-confusion element. *CAE*, 268 F.3d at 678; *see Coyne*, 41 F. Supp. 3d at 717.

Slep-Tone pleads facts sufficient to satisfy several of the likelihood-of-confusion factors. Similarity of the marks turns on whether the appearance and placement would be so indistinguishable that a consumer would associate one with the other. *Packman v. Chi. Tribune Co.*, 267 F.3d 628 (7th Cir. 2001). In this case, the similarity inquiry is simple—Slep-Tone alleges that the exact same mark is being used on inferior products. First Am. Compl. ¶ 65-67. There are also allegations supporting similarity of products. The media-shifted tracks are often "virtually indistinguishable" from Slep-Tone's tracks, *id.* ¶ 32, and even those that are degraded in quality are still karaoke accompaniment tracks with many of the

15

same features as Slep-Tone's tracks, *id.* ¶ 67. Proof of ill intent requires evidence that a defendant was attempting to "pass off" products as having come from the plaintiff, but mere knowledge of an existing mark is not sufficient. *Packman*, 267 F.3d at 644. Here, Slep-Tone offered Sellis several chances to legitimize the tracks that its karaoke operators used. First Am. Compl. ¶¶ 75-77. Sellis, at a minimum, had knowledge of her contractors' unauthorized use of Slep-Tone's mark. Sellis argues that there can be no actual confusion because the tracks at issue were created by Slep-Tone. Defs.' Mot. Dismiss at 12. But, as discussed above, *Dastar* compels the conclusion that the person who copied Slep-Tone's tracks onto new media is the originator of those tracks, *not* Slep-Tone. Although Slep-Tone has not pled incidents of actual confusion, the similarity of the tracks and the use of Slep-Tone's mark on the copied tracks support an inference of actual confusion. Because Slep-Tone has alleged facts sufficient to suggest that it could establish a likelihood of confusion, the motion to dismiss is denied.

## IV. Conclusion

For the reasons set forth above, *Dastar* does not bar Slep-Tone's claims and Slep-Tone has otherwise adequately stated a claim for relief under the Lanham Act and the Illinois Uniform Deceptive Practices Act. Defendants' motion to dismiss is denied.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: April 3, 2015